UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL GARCIA,<br><br>    Plaintiff,<br><br>    v.<br><br>F. FOLKS, et al.,<br><br>    Defendants. | No. 2:14-cv-2378 JAM DB P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges defendants violated his Eighth Amendment rights by subjecting him to inhumane conditions of confinement. On October 22, 2018, the undersigned held an evidentiary hearing on the issue of plaintiff's exhaustion of his administrative remedies. Attorney Douglas Thorn appeared for plaintiff. Deputy Attorney General Aseil Mohmoud appeared for defendants. After considering the testimony of the witnesses at the evidentiary hearing and the record in this case, this court will recommend that the district court find plaintiff has satisfied the exhaustion requirement.

## BACKGROUND

**I.    Allegations of the Complaint**

This case is proceeding on plaintiff's original complaint filed here on October 6, 2014. (ECF No. 1.) Plaintiff complains of conduct that occurred when he was incarcerated at High

Desert State Prison ("HDSP") in 2013. Plaintiff's claims have been thoroughly described previously (see ECF No. 96) and are summarized here.

Plaintiff contends that when he arrived at HDSP in March 2013, he was placed in a cell in administrative segregation ("ad seg") in Z unit. The cell was filthy and he was provided no hygiene products. He was not provided all meals and the meals he was provided were thrown onto the floor of his cell or contained foreign objects. In April 2013, plaintiff experienced severe stomach pain and vomiting. Defendants refused to get plaintiff medical attention for a week. Finally, when plaintiff was seen by medical staff, he was diagnosed with h-pylori bacteria in his digestive system. Plaintiff contends he contracted h-pylori because his food and living conditions were not sanitary.

When plaintiff asked defendants, and other staff members, for CDCR 602 forms, the forms for inmate appeals, they refused to provide them to him. Plaintiff was able to obtain some 602 forms from other inmates. However, when he attempted to submit them, defendants ripped them up. After plaintiff was moved to a new cell, he was able to send a 602 form through the U.S. mail directly to the Office of Appeals, the third level of review. However, that form was returned to him without having been reviewed because he had bypassed the first two levels of the appeal process.

**II.     Procedural Background**

On screening plaintiff's complaint, the court found plaintiff stated the following potentially cognizable claims regarding the conditions of his confinement at HDSP: (1) First Amendment retaliation claims against all defendants; (2) Eighth Amendment claims based on the mishandling of plaintiff's food against defendants Cox, Foulk, Loftin, and Riley; (3) Eighth Amendment claims based on plaintiff's living conditions against defendants Cox, Foulk, Loftin, Madrigal, Riley, Witcheal, and Wung; and (4) Eighth Amendment claims regarding plaintiff's serious medical needs against Cox, Loftin, Madrigal, Riley, Witcheal, and Wung. (ECF No. 14.) On June 9, 2016, defendants Cox, Foulk, Holmes, Loftin, Madrigal, Witcheal, and Wung filed an answer to the complaint. (ECF No. 30.) On November 14, 2016, defendant Riley filed an answer. (ECF No. 45.)

On June 26, 2016, all defendants filed a motion for summary judgment. (ECF No. 80.) Defendants contended plaintiff failed to exhaust his administrative remedies, that the undisputed facts showed that plaintiff's claims should fail on the merits, and that defendants are entitled to qualified immunity on the conditions of confinement claims. This court recommended denial of defendants' motion on the issue of exhaustion and denial without prejudice on the merits. This court further recommended an evidentiary hearing be held on the exhaustion issues. (ECF No. 96.) The district court adopted those recommendations on March 30, 2018. (ECF No. 104.)

On May 31, 2018, this court appointed Mr. Thorn for the limited purpose of representing plaintiff for the resolution of the exhaustion issue. (ECF No. 109.) On October 22, 2018, this court held the evidentiary hearing. (ECF No. 121.)

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

**I.    Legal Standards**

**A.  PLRA Exhaustion Requirement**

The Prison Litigation Reform Act of 1995 ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Compliance with deadlines and other critical prison grievance rules is required to exhaust. Woodford v. Ngo, 548 U.S. 81, 90 (2006) (exhaustion of administrative remedies requires "using all steps that the agency holds out, and doing so properly"). "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' - rules that are defined not by the PLRA, but by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007) (quoting Woodford, 548 U.S. at 88); see also Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009) ("The California prison system's requirements 'define the boundaries of proper exhaustion.'" (quoting Jones, 549 U.S. at 218).)

Although "the PLRA's exhaustion requirement applies to all inmate suits about prison life," Porter v. Nussle, 534 U.S. 516, 532 (2002), the requirement for exhaustion under the PLRA is not absolute, Albino v. Baca, 747 F.3d 1162, 1172-72 (9th Cir. 2014) (en banc). As explicitly

3

stated in the statute, "[t]he PLRA requires that an inmate exhaust only those administrative remedies 'as are available.'" Sapp v. Kimbrell, 623 F.3d 813, 822 (9th Cir. 2010) (quoting 42 U.S.C. § 1997e(a)) (administrative remedies plainly unavailable if grievance was screened out for improper reasons); see also Nunez v. Duncan, 591 F.3d 1217, 1224 (9th Cir. 2010) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available."). "We have recognized that the PLRA therefore does not require exhaustion when circumstances render administrative remedies 'effectively unavailable.'" Sapp, 623 F.3d at 822 (citing Nunez, 591 F.3d at 1226); accord Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) ("The obligation to exhaust 'available' remedies persists as long as some remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance.").

"Nonexhaustion" is "an affirmative defense" and defendants have the burden of "prov[ing] that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1171-72. A remedy is "available" where it is "capable of use; at hand." Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting Albino, 747 F.3d at 1171). Grievance procedures that do not allow for all types of relief sought are still "available" as long as the procedures may afford "some relief." Booth v. Churner, 532 U.S. 731, 738 (2001). If a defendant meets the initial burden, a plaintiff then must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Albino, 747 F.3d at 1172. Remedies are "effectively unavailable" where they are "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." Id. (quoting Hilao v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996)). "[T]he ultimate burden of proof," however, never leaves the defendant. Id.

**B. California's Inmate Appeal Process**

In California, prisoners may appeal "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).

4

Inmates in California proceed through three levels of appeal to exhaust the appeal process: (1) formal written appeal on a CDCR 602 inmate appeal form; (2) second level appeal to the institution head or designee; and (3) third level appeal to the Director of the California Department of Corrections and Rehabilitation ("CDCR"). Cal. Code Regs. tit. 15, § 3084.7. Under specific circumstances, the first level review may be bypassed. Id. The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies. See id. §3084.7(d)(3).

A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him. Butler v. Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002). In submitting a grievance, an inmate is required to "list all staff members involved and shall describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(3). Further, the inmate must "state all facts known and available to him/her regarding the issue being appealed at the time," and he or she must "describe the specific issue under appeal and the relief requested." Cal. Code Regs. tit. 15, §§ 3084.2(a)(4). An inmate has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed." Cal. Code Regs. tit. 15, § 3084.8(b).

**II.     Facts**

The facts adduced at the evidentiary hearing and available in the record show the following.

  **A.     Submission of Appeals by Ad Seg Inmates at HDSP**

The HDSP appeals coordinator in 2013 testified that there were two ways for inmates in ad seg to obtain 602 forms. The first was in their arrival packet. Officer Holmes, who worked in Z unit at HDSP in 2013, testified that when inmates first arrived at HDSP, they were provided with a pack of hygiene materials and other items, including a 602 form. The second way to obtain a 602 form was to ask staff for one. Officer Holmes testified that one day each week, an officer went to each cell to ask inmates if they required any supplies. Inmates could ask for, and be provided with, 602 forms at that time.

Typically, inmates in ad seg submitted 602 appeals by placing them in the slot in their cell door for mail pickup. Officers working during the third watch, 2:00 p.m. to 10:00 p.m., picked up the mail. Once an inmate placed his mail in the slot, any officer who walked by had access to it. Inmates in ad seg could also submit appeals by handing them to any staff member. Facility Captain Albanico testified that in 2013 at HDSP even if an appeal about staff misconduct was untimely under the regulations, it would have been processed. There was no testimony, however, that inmates were informed about this exception to the regulations. Further, the court notes that the CDCR 602 forms state on their face that "You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that lead to the filing of this appeal.[1]"

During the time period that plaintiff was incarcerated in Z unit, some inmates there were able to submit appeals.

### B. Plaintiff's Ability to Submit Appeals

#### 1. Plaintiff's Incarceration at HDSP

In March 2013, plaintiff was incarcerated at Pelican Bay State Prison ("PBSP"). On March 27, 2013, after being charged with attempting to murder a correctional officer, plaintiff was transported to HDSP. Shortly after midnight on March 28, he was placed in cell 112 in Z unit, an ad seg unit. Around noon that day, he was moved to cell 129, also in Z unit. For the first two weeks plaintiff was in cell 129, there were no other inmates in the cells nearby. (See Movements of Inmates (ECF No. 89 at 200-28).[2] ) On August 6, 2013, plaintiff was moved to the ad seg area in D facility at HDSP. He was transferred out of HDSP on October 30, 2013. (D Ex. 1.[3] )

---

[1] https://prisonlaw.com/wp-content/uploads/2017/09/AdminAppealsWITHattachmentsSept-2017-.pdf

[2] Plaintiff attached these records to his opposition to defendants' summary judgment motion. He explained that they had been provided to him by defendant Foulks in discovery. He included a copy of Foulks' responses to plaintiff's request for production of documents that confirms that Foulks provided plaintiff with these records and that they reflect the inmates occupying cells in Z unit in March and April 2013. (See ECF No. 89 at 148-49.)

[3] Because both parties identified their evidentiary hearing exhibits with numbers, the court refers to defendants' exhibits as "D Ex. #" and plaintiff's exhibits as "P Ex. #."

### 2. Plaintiff's Access to Appeal Forms

Plaintiff testified that he received the arrival pack when he first arrived at HDSP and was placed in cell 112. However, when he was moved to cell 129, he was not allowed to take, and was not provided, that pack of materials and had no copies of the 602 form or any other supplies.

Plaintiff further testified that he asked numerous correctional officers, including many of the defendants in this case, for 602 forms, but they all refused. Eventually, when other inmates were moved into the nearby cells, plaintiff was able to obtain 602 forms and a pen from some of them. He was also able to obtain CDCR 22 forms, inmate requests for an interview, item, or services.

### 3. Plaintiff's Ability to Submit Appeals

#### a. Plaintiff's Testimony

Plaintiff testified that prior to arriving at HDSP, he understood how to submit appeals while in ad seg. He understood that inmates should place a 602 form in an envelope addressed to the appeals coordinator and put it in the slot in their cell door. Third watch officers would then pick up the envelope when they picked up the mail, which, plaintiff testified, was usually about 8:00 p.m.

He further testified that he attempted more than six times to submit an inmate appeal regarding the conditions of his cell and food. From plaintiff's testimony, it appears that the only way he attempted to submit appeals was by leaving them in an envelope in the tray slot of his cell when it was getting dark out. However, most times he did so, according to plaintiff, officers ripped up his appeals. Plaintiff testified that usually the officer would pick up the appeal, read it, and then return to stand in front of plaintiff's cell to rip it up. Plaintiff testified that he saw defendants Cox, Loftin, and Holmes each rip up one of his appeals in this way. Plaintiff did not know the identification of the other officers who destroyed his forms.

Plaintiff did not see every one of his appeals ripped up. According to his testimony, he does not know what happened to some of the appeals he submitted. He testified that he believes they were not delivered because he never received a response to them.

////

1    Plaintiff described an incident involving defendants Holmes and Loftin. They came to
2    plaintiff's cell to take him to a rules violation ("RVR") hearing. Plaintiff had a 602 form in his
3    hands. When the officers saw it, they told plaintiff he could not take it with him. When plaintiff
4    refused to relinquish the 602 form, the officers told plaintiff they would not take him to the RVR
5    hearing and would tell the hearing officer plaintiff refused to attend.[4]

    Plaintiff also testified that he received CDCR 22 forms. He wrote them to various staff at
the prison, including the warden. He testified that he used those forms to describe officers
throwing food at him, the dirty state of his cell, and his inadequate mattress. However, he only
received a response to one of the CDCR 22s he submitted. He had asked the appeals coordinator
if his 602 appeals had been received. He got a response that the appeals coordinator had received
no 602s from plaintiff.

    According to plaintiff, when he was moved to D unit, he sent an appeal form through the
U.S. mail to the Office of Appeals in Sacramento. The Office of Appeals considers appeals at the
third level of review. That office did not consider plaintiff's appeal because he had failed to go
through the first and second levels of review. The appeal form was returned to plaintiff. Records
provided by defendants show that the Office of Appeals received an appeal from plaintiff on
September 25, 2013. It was assigned IAB #1303753. The records show that the appeal was
"screened out" on October 22, 2013 because the appeal was "not authorized to bypass any level."
(D Ex. 4.)

    When asked why he had not attempted to submit 602 appeals through the proper channels
when he was moved to D unit, plaintiff responded that he did not think things would be any
different there. He also testified that he knew his time limit for filing appeals regarding the
events in Z unit had expired.

////

---

[4] The court notes that it previously described plaintiff's version of this event as ending with the officers ripping up plaintiff's appeal form. (See ECF No. 96 at 16.) However, a closer reading of plaintiff's complaint shows that he did not describe Holmes and Loftin ripping up that complaint form. Rather, plaintiff stated that they prevented him from submitting it by telling him he could not attend the RVR hearing if he took the 602 form with him. (ECF No. 1 at 12-13.)

8

Plaintiff testified that he gave the returned 602 appeal form and a 22 form to inmate Jacobs, who was helping him prepare his federal § 1983 complaint. Plaintiff understood that Jacobs would attach the forms to the complaint. However, plaintiff recognized that no appeal forms were attached to the complaint filed here. He testified that he communicated with Jacobs through Jacob's family members. He told them he needed copies of his 602 and 22 forms. Then, when he was incarcerated at California State Prison-Corcoran, he received a form stating that the prison had received mail addressed to him but that he could not have it because he and the sender, inmate Jacobs, were not authorized to correspond with each other. Plaintiff then filed a CDCR 22 form asking whether the letter from Jacobs had included legal material. He received a response that it had. Plaintiff introduced a copy of that CDCR 22 form, dated March 22, 2016. (P Ex. 3.) It confirms plaintiff's testimony. Plaintiff testified that he never received those forms from Jacobs.

### b. Officers' Testimony

Officers Cox, Loftin, and Holmes testified at the evidentiary hearing. Each testified that in 2013 he was assigned to Z unit at HDSP. Each further testified that in 2013 he was assigned to work the second watch, from 6:00 a.m. to 2:00 p.m.

Holmes testified that he recalled plaintiff only vaguely and did not recall any interactions or conversations with or about plaintiff. However, Holmes also testified that plaintiff never handed him a 602 appeal. Holmes testified that he occasionally worked overtime in Z unit into the third watch. He estimated that in 2013 he only did so about six times and was only on the floor of Z unit once. Usually, Holmes testified, he worked in the control booth if he was on third watch in Z unit. If he worked there, he was not responsible for picking up inmate mail and was required to stay in the control booth until he was relieved at 10:00 p.m. by the officer on the next shift. Holmes testified that he has never ripped up any prisoner's appeal forms.

Cox testified that he did not recall plaintiff or any interactions with him. He testified that because he worked on the second watch shift, he rarely dealt with prisoner appeals. However, he also testified that he worked overtime. Like Holmes, Cox testified that he has never ripped up an inmate's appeal form.

9

1    Loftin first testified that he recalled that HDSP had received inmate Garcia from PBSP.

2    He testified that he did not "specifically" know why plaintiff had been transferred. When defense

3    counsel attempted to question Loftin about what he did know about the reason for plaintiff's

4    transfer, Loftin changed course and testified that he did not recall plaintiff. He testified that he

5    recalled no interactions or discussions with or involving plaintiff. While Loftin testified that he

6    never destroyed plaintiff's appeals, he explained that while he did not recall plaintiff, he knew he

7    had not destroyed his appeals because he "would never" do something like that. There was no

8    testimony about whether or how often Loftin worked overtime in Z unit.

### c. Other Evidence

Plaintiff attempted to introduce a document entitled "2015 Special Review: High Desert State Prison." It is dated December 2015 and was prepared by the Office of the Inspector General ("OIG"). Plaintiff's counsel pointed to page 27 of that report. That page states that:

> The OIG reviewed dozens of complaints, filed by both inmates and staff, related to the processing of inmate appeals. Some of the allegations included:
>
> •    Appeals were being destroyed or discarded, never being delivered to the Appeals Office.
>
> •    Appeals were being read by officers, and if the appeal contained a complaint against staff, the inmate was subjected to retaliation or the appeal was destroyed.
>
> •    Staff complaints were never addressed.
>
> •    Appeals were being shredded by Appeals Office staff.

(P Ex. 1.)

Defendants' counsel objected to the admission of this exhibit on the grounds that it lacked foundation, is hearsay, and is not relevant. When the court questioned defendants' counsel about whether she was contending that the exhibit was not, in fact, what was identified on its cover, defendants' counsel stated only that she could not confirm that every page of the exhibit was correct. She did not challenge the validity of page 27. This court informed counsel at the hearing that it would take the objections under submission.

////

In addressing defendants' objections, the court first notes that plaintiff attached a copy of this report to his summary judgment motion. In their reply, defendants relied on a memorandum attached to the report. (See ECF No. 92 at 4.) Defendants did not challenge the validity of the report at that time.

This court found this report on the website of the OIG.[5] Based on this court's review, the online version of the report appears to be identical to the copy provided by plaintiff. Accordingly, the court overrules defendants' objection that the report lacks foundation. See Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534, 551 (D. Md. 2007); Estate of Gonzales v. Hickman, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *2 n. 3 (C.D. Cal. May 30, 2007) (court rejects similar objections to an OIG report); see also Fed. R. Evid. 902(5) (publications issued by a public authority are self-authenticating).

This court further overrules the relevance objection. This court recognizes that the report was prepared two years after the events complained of in this case. Additionally, it does not specifically refer to the handling of appeals by inmates in the ad seg units but appears to reference the handling of appeals at HDSP generally. That said, the report found that staff and inmates had complained about HDSP officers' destruction of appeals, mirroring plaintiff's contentions in this case. There is no question that it has some relevance to plaintiff's argument that he was unable to exhaust his administrative remedies.

Finally, the court agrees that the substance of the complaints summarized at page 27 is hearsay. However, the court may consider the fact that the OIG reviewed numerous complaints by inmates and staff that described destruction of appeals similar to what has been described by plaintiff. Even if that statement in the report is itself hearsay, it would be subject to the public records exception. See Fed. R. Evid. 803(8); Lorraine, 241 F.R.D. at 551 (When Evidence Rules 902(5) and 803(8) are combined, "official publications posted on government agency websites should be admitted into evidence easily."); Estate of Gonzales, 2007 WL 3237727, at *2 n. 3. Defendants provide the court with no reason to doubt that the OIG reviewed complaints regarding the handling of appeals at HDSP.

---

[5] https://www.oig.ca.gov/media/reports/Reports/Reviews/2015_Special_Review_-_High_Desert_State_Prison.pdf.

**III. Analysis**

As described above, defendants have the initial burden of establishing that there was a method for submitting appeals in the ad seg units at HDSP in 2013. Then, the burden shifts to plaintiff to show that this method was not available to him. The ultimate burden of proof to establish the exhaustion defense rests with defendants.

Defendants have met their burden of showing that the ad seg units at HDSP had procedures for obtaining appeals forms and submitting appeals. Testimony showed that inmates received 602 forms in their arrival packets and could request them from staff during the weekly supply rounds. To submit an appeal, an ad seg inmate could give it to any staff member or could place it in the food slot of his cell to be picked up during mail rounds, sometime in the evening. Defendants presented evidence that other inmates in ad seg at HDSP at that time were able to submit 602 appeals.

To support his burden of unavailability, plaintiff testified both that he was unable to obtain 602 forms through the normal channels and that his attempts to submit forms were thwarted. Plaintiff testified that he was not provided 602 forms once he was moved to cell #129 and that when he asked officers and others for 602 forms, they refused to provide them. Defendants presented no testimony or other evidence to directly rebut plaintiff's testimony about his inability to access 602 forms. Defendants may not simply rely on the fact that the prison had a system in place to provide ad seg inmates with appeal forms to overcome plaintiff's showing that he was unable to obtain one. See Williams v. Paramo, 775 F.3d 1182 (9th Cir. 2015); Dillon v. Rogers, 596 F.3d 260, 268-69 (5th Cir. 2010) (records showing 53 other inmates had filed grievances during the period in question did not demonstrate that administrative remedy was available to plaintiff).

Plaintiff also testified that after he obtained forms from other prisoners, every attempt he made to submit one was, apparently, subverted by officers. Plaintiff testified that he saw officers rip up most of the forms he put in his cell door slot for mail pickup. He further testified that while he does not know the fate of other forms, he was told by the appeals coordinator that they did not reach that office.

12

According to plaintiff, when he was moved to D facility he knew that it was too late to submit appeals for things that had occurred months previously. In addition, he felt it was likely the same things would happen if he attempted to leave his 602 forms out for prison mail pickup. Plaintiff sent the 602 form he attempted to take to his rules violation hearing through the U.S. mail to the third level of review.

There is limited corroboration for plaintiff's testimony. There is evidence that he submitted an appeal to the Office of Appeals in Sacramento in September 2013. That evidence corroborates plaintiff's testimony that the appeal was not accepted because he had failed to go through the first two levels of review. In addition, plaintiff's testimony that inmate Jacobs had possession of his 602 and 22 forms is corroborated by the copy of his CDCR 22 asking whether Jacobs had sent him legal materials such as 602 and 22 forms. Finally, the court notes that plaintiff's testimony is, in most important respects, the same as the allegations in his 2014 complaint, filed shortly after the events at issue here.

It remains unclear why plaintiff was able to submit 22 forms, at least one of which reached its destination because he received a response but was unable to submit 602 forms. Plaintiff testified that he gave another inmate the 22 form addressed to the warden, but he did not explain how he submitted the others.

Defendants' testimony contradicted plaintiff's. Defendants Holmes and Cox testified that they have never destroyed an inmate appeal. Loftin testified that he "would never have" done so. In addition, these officers were assigned to the second watch. Mail was collected on third watch. Plaintiff testified in court and at his deposition[6] that he saw each of these defendants rip up one of his appeals. Plaintiff recognized that those officers typically worked the second watch. He stated that they destroyed his appeals during third watch when they were working overtime.

Defendants presented little evidence about when and how often they worked during third watch in Z unit. The only defendant to do so was Holmes. He estimated he only worked on the floor of Z unit once during third watch in 2013. The implication was that this would have been

---

[6] (Plt.'s Depo. at 66, 130-31, 144.)

the only time he had access to plaintiff's mail.  There was no testimony regarding how often the other two defendants, Cox and Loftin, worked during third watch in Z unit in 2013.  Cox testified only that he did work overtime.

If Holmes, Cox, and Loftin rarely worked during third watch, the court is surprised that defendants did not present evidence to support that contention.  Defendants should have had ready access to those records.  That said, this court recognizes that it would have been a coincidence, particularly with respect to Holmes, if plaintiff happened to attempt to submit a 602 form on the nights that each of these defendants happened to work overtime.

The court finds some aspects of these officers' testimony difficult to believe.  Each testified that he did not remember plaintiff.  While the court recognizes that officers interact with many, many inmates each year, it is hard to imagine they did not recall plaintiff based on a couple factors.  First, plaintiff was transferred to their care because he had been charged with stabbing a correctional officer.  While there was no evidence about the frequency with which these officers encountered inmates charged with attempting to murder another officer, the court finds it is likely a memorable situation.  Second, plaintiff was originally isolated in his cell area.  For two weeks, plaintiff's cell was the only occupied cell in his wing.  That fact would seem to have made him stand out to the officers working there.

In sum, this court finds it a very close call whether defendants have met their burden of showing plaintiff had the ability to exhaust his administrate remedies if he had chosen to do so.  Neither the officers' nor plaintiff's testimony was completely credible.  However, this court finds plaintiff's unrebutted testimony regarding his inability to obtain 602 forms from officers or prison staff to be believable.  Further, the fact that plaintiff was able to submit 22 forms, which would have been addressed to the intended recipient (see P Ex. 3), does not prove that he was able to submit 602 forms the same way, particularly where those forms were addressed to the appeals coordinator and, therefore, were more obviously complaints.

Even if plaintiff could have given his 602 forms to other inmates to submit, he was certainly not required to do so in order to be excused from the exhaustion requirement.  Plaintiff should not have to make repeated attempts to both obtain and submit 602 forms to be deemed to

14

have satisfied the exhaustion requirement. See Cato v. Darst, No. 2:14-cv-0959 TLN KJN P, 2016 WL 1734759, at *7 (E.D. Cal. May 2, 2016) (prisoner not obligated to continue trying to exhaust administrative remedies after prison officials thwart his attempts to do so).

Where the weight of the evidence is balanced on each side, this court focuses on the burden of proof. Here, this court finds defendants have not met that burden.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The court find plaintiff has satisfied the exhaustion requirement because administrative remedies were effectively unavailable to him; and
2. This case proceed to the merits of plaintiff's claims.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, either party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 1, 2019

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/garc2378.exh fr

15